Case Nos. 14-3575/14-3833/14-3834

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JIM & LAURIE GIBSON, as next friends of Chloe Gibson,

*Plaintiffs-Appellees & Cross-Appellants,*

v.

FOREST HILLS LOCAL SCHOOL DISTRICT BOARD OF EDUCATION,

*Defendant-Appellant & Cross-Appellee.*

On Appeal From The United States District Court
For The Southern District of Ohio, Case No. 1:11-CV-00329

## BRIEF OF AUTISM SPEAKS, COUNCIL OF PARENT ATTORNEYS & ADVOCATES, INC., DISABILITY RIGHTS TENNESSEE, MICHIGAN PROTECTION AND ADVOCACY SERVICE, INC., AND NATIONAL DISABILITY RIGHTS NETWORK AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS-APPELLEES/CROSS-APPELLANTS

Neil N. Vakharia (Ohio 0088203)
 *Counsel of Record*
JONES DAY
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:   (216) 579-0212

Chad A. Readler (Ohio 0068394)
Kimberly A. Jolson (Ohio 0081204)
JONES DAY
325 John H. McConnell Boulevard
Suite 600
Columbus, OH  43216-5017
Telephone: (614) 469-3939
Facsimile:  (614) 461-4198

## **RULE 26.1 DISCLOSURE**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit

Rule 26.1, *amici* make the following disclosures:

1.      Are any *amici* a subsidiary or affiliate of a publicly owned corporation?

No.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a

financial interest in the outcome?  No publicly owned corporation or other

publicly held entity has a direct financial interest in the outcome of this

litigation due to the participation of *amici*.


/s/ Neil N. Vakharia

Neil N. Vakharia
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

RULE 26.1 DISCLOSURE .................................................................i

INTERESTS OF AMICI CURIAE.........................................................1

SUMMARY OF ARGUMENT ............................................................4

ARGUMENT .................................................................................6

I.    THE IDEA'S LEGISLATIVE HISTORY AND PURPOSE COMPEL INCLUSIVE POLICIES IN TRANSITION PLANNING...........................6

    A.    Congress Enacted the Education of All Handicapped Children Act to Protect All Students, Regardless of Disability .........................8

    B.    The Individuals with Disabilities Education Act Likewise Protects All Students and Emphasizes Inclusive Transition Planning .......................................................................12

II.    STUDENT PARTICIPATION IS CRITICAL FOR A SUCCESSFUL TRANSITION ..........................................................................16

    A.    The Student Is at the Center of the IDEA's Emphasis on Transition Services...............................................................17

    B.    A Lack of Adherence to the IDEA's Transition Policy Fails to Meet the Law's Goals........................................................18

    C.    Student Involvement in Transition Planning Yields Better Outcomes.........................................................................21

CONCLUSION .............................................................................23

CERTIFICATE OF COMPLIANCE......................................................25

CERTIFICATE OF SERVICE ............................................................26

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Carrie I. v. Dep't of Educ.*,
   869 F. Supp. 2d 1225 (D. Haw. 2012)................................................15

*Forest Grove Sch. Dist. v. Student*,
   No. 3:12-cv-01837 (D. Or. June 9, 2014).........................................15

*Garrity v. Gallen*,
   522 F. Supp. 171 (D.N.H. 1981)......................................................11

*Gladys J. v. Pearland Indep. Sch. Dist.*,
   520 F. Supp. 869 (S.D. Tex. 1981)..................................................11

*Kruelle v. New Castle Cnty. Sch. Dist.*,
   642 F.2d 687 (3d Cir. 1981) ...........................................................11

*Oberti v. Bd. of Educ. of Borough of Clemonton Sch. Dist.*,
   801 F. Supp. 1392 (D.N.J. 1992)................................................8, 23

*Timothy W. v. Rochester, N.H., Sch. Dist.*,
   875 F.2d 954 (1st Cir. 1989)........................................................9, 10

*Vance v. Spencer Cnty. Pub. Sch.*,
   No. 3:96-cv-449 (W.D. Ky. Jan. 4, 1999) ......................................16

**FEDERAL STATUTES**

20 U.S.C. § 1401 ...............................................................................13

20 U.S.C. § 1412(a)(3)(A) ...................................................................9

20 U.S.C. § 1414(d)(1)(B)-(D) ............................................................5

Individuals with Disabilities Education Act ...................................passim

Education for All Handicapped Children Act..................................passim

## REGULATIONS

34 C.F.R. § 300.321 ...............................................................passim

64 Fed. Reg. 12,406 (Mar. 12, 1999)............................................12, 13, 14

71 Fed. Reg. 46,540 (Aug. 14, 2006).....................................................14

## OTHER AUTHORITIES

120 Cong. Rec. S15271 (1974).................................................................8

121 Cong. Rec. S37413 (1975).................................................................10

Erik W. Carter et al., *Factors Associated with the Early Work Experiences of Adolescents with Severe Disabilities*, 49 Intellectual & Development Disabilities 233 (2011)................................................18, 19, 21

Erik W. Carter et al., *Predictors of Postschool Employment Outcomes for Young Adults with Severe Disabilities*, 23 J. of Disability Policy Studies 50 (2012) .......................................................................17, 18

Shattuck P. Carter et al., *Postsecondary Education and Employment Among Youth with an Autism Spectrum Disorder*, 129 Pediatrics 1042 (2012) ............................................................................18

Nicholas Certo et al., *Seamless Transition and Long-Term Support for Individuals with Severe Intellectual Disabilities*, 33 Research & Practice for Persons with Severe Disabilities 85 (2008) ....................................18

Melissa C. George, *A New IDEA: The Individuals with Disabilities Education Act After the 1997 Amendments*, 23 Law & Psychol. Rev. 91 (1999) .........................................................................9

David Hagner et al., *Outcomes of a Family-Centered Transition Process for Students with Autism Spectrum Disorders*, 27 Focus on Autism & Other Developmental Disabilities 42 (2012) ....................................20

Paula D. Kohler & Sharon Field, *Transition-Focused Education: Foundation for the Future*, 37 J. of Spec. Ed. 174 (2003) ..............13, 15, 21, 22

Edwin Martin et al., *The Legislative and Litigation History of Special Education,* The Future of Children (1996) ..........................................8

Dean Hill Rivkin, *Legal Advocacy and Education Reform: Litigating School Exclusion*, 75 Tenn. L. Rev. 265 (2008)...................................................16

Patricia Rogan & Susan Rinne, *National Call for Organizational Change from Sheltered to Integrated Employment*, 49 Intellectual & Developmental Disabilities 248 (2011)......................................................20, 22

Bonnie Spiro Schinagle, *Considering the Individualized Education Program: A Call for Applying Contract Theory to an Essential Legal Document*, 17 CUNY L. Rev. 195 (2013)..................................................14

Michael Wehmeyer & Margaret Lawrence, *Whose Future Is It Anyway?  Promoting Student Involvement in Transition Planning*, 18 Career Development for Exceptional Individuals 69 (1995) .................19, 21

Michael L. Wehmeyer & Michelle Schwartz, *The Self-Determination Focus of Transition Goals for Students with Mental Retardation*, 21 Career Development for Exceptional Individuals 75 (1998) ...........17, 20, 22

Jaimie Ciulla Timmons, *Choosing Employment: Factors that Impact Employment Decisions for Individuals with Intellectual Disability*, 49 Intellectual & Developmental Disabilities 285 (2011)...................................22

# INTERESTS OF *AMICI CURIAE*[1]

Autism Speaks is the leading not-for-profit organization in the world dedicated to increasing awareness of autism spectrum disorders (ASD); funding research into the causes, prevention, treatments and potential cures for autism; and advocating to vindicate the rights of individuals with autism and their families before courts, legislatures, insurers and other decision making bodies.  Because of the historically low rates of employment and lack of community integration for adults with autism, adequate transition planning and services are critically important for students with autism and can make a profound difference in their futures.

The Council of Parent Attorneys and Advocates, Inc. (COPAA), is an independent, nonprofit peer-to-peer network of attorneys, advocates, parents, and related professionals dedicated to protecting and enforcing legal and civil rights of students with disabilities and their families at the national, state, and local levels. COPAA works to increase the quality and quantity of advocate and attorney representation, and believes the key to accessing individualized, effective

---

[1] Pursuant to Federal Rule of Appellate Procedure 29, *amici* certify that all parties have consented to the filing of this brief.  *Amici* likewise certify that no party's counsel in this matter authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the brief's preparation or submission; and no person other than *amici* and their members and counsel contributed money intended to fund the brief's preparation or submission.

educational programs is assuring that students with disabilities and their parents are equal members of the educational team.

Disability Rights Tennessee (DRT) is a federally funded and authorized Protection and Advocacy (P&A) organization that has provided information, referral, advocacy, and legal services to people with disabilities in Tennessee since 1978.  DRT advocates for systemic change through direct representation in selected individual cases and/or complex litigation involving discrimination and rights violations in multiple settings including schools.  DRT has represented students with disabilities in cases involving transition services and currently serves on several employment and transition statewide committees and task forces.

Michigan Protection & Advocacy Services, Inc. (MPAS), is the independent, private, nonprofit organization designated by the governor of the State of Michigan to advocate and protect the legal rights of people with disabilities in Michigan. MPAS services include information and referral, short-term assistance, selected individual and legal representation, systemic advocacy, monitoring, and training. MPAS's mission is to advocate and protect the legal rights of people with disabilities by working towards systemic changes that advance the rights of all people with disabilities, and advocating for individual rights through litigation.

The National Disability Rights Network (NDRN), is the non-profit membership association of P&A agencies located in all 50 states, the District of

Columbia, Puerto Rico, and the United States Territories.  P&A agencies are authorized under various federal statutes to provide legal representation and related advocacy services, and to investigate abuse and neglect of individuals with disabilities in a variety of settings.  Together, the P&A agencies are the nation's largest provider of legally-based advocacy services for persons with disabilities. Disability Rights Ohio, counsel for plaintiffs in this case, is a member agency of NDRN.  NDRN supports its members through the provision of training and technical assistance, legal support, and legislative advocacy, and works to create a society in which people with disabilities enjoy equal opportunities and are able to participate fully through choice and self-determination.

## SUMMARY OF ARGUMENT

The Forest Hills Local School District decided not to invite Chloe to attend her individualized education program (IEP) team meetings where her transition goals and future were discussed.  Forest Hills' basis for excluding Chloe was its belief that she "was not capable of understanding the concept of transitioning to a post-school life and activities" nor was she "able to express her [own] post-school interests and preferences."  Defs.' Br. at 39.  Further, Forest Hills took no affirmative steps to ensure that Chloe's interests and preferences were considered in developing her post-secondary goals or in determining which services would best meet her needs.  *See* Gibsons' Br. at 45 (noting that Forest Hills offered no testimony of affirmative steps it took to consider Chloe's preferences).  Instead, Forest Hills decided that Chloe would participate in a recreational/leisure environment after leaving Anderson High School, rather than a supported work environment, and that job training would have taken attention away from other activities that Forest Hills deemed more appropriate for Chloe.  *See* Dist. Ct. Order, R. 49, PageID# 967-69.  As a result, Forest Hills failed to consider adequately Chloe's personal goals when creating her transition plan.  *Amici curiae* believe the Forest Hills' actions violate the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1401 *et seq.*, and jeopardize not only Chloe's future, but also other students' as well.

The Gibsons rightly interpret the IDEA and its attendant regulations, 20 U.S.C. § 1414(d)(1)(B)-(D); 34 C.F.R. § 300.321(a), to require that a student, like Chloe, be invited to all transition services meetings.  A contrary reading would make portions of the administrative regulations superfluous.  *See* Gibsons' Br. at 44.  Thus, the Gibsons are correct, and the law requires students be invited to transition planning meetings.  Apart from the text itself, *amici curiae* offer two additional grounds supporting the Gibsons' interpretation.

First, excluding certain students from participating in the planning of their future runs counter to both the purposes and legislative history of the IDEA and its predecessor, the Education for All Handicapped Children Act (EAHCA).  Congress passed these laws to address the mindset that some children were simply "uneducable" and unworthy of equal protection of the law.  The IDEA should be construed in a way that affords its procedural safeguards to all students, regardless of disability.  Allowing a school district to exclude a student, based solely on the school district's unilateral assessment of the student, undermines the purpose of the law.

Second, the research confirms that excluding a student from the transition process lessens her chance for future success.  Students with disabilities, and especially those students with severe disabilities, often leave secondary education ill equipped to live independent, productive lives.  These outcomes are particularly

prevalent among female students like Chloe.  But all students, including those with severe disabilities, have better post-transition outcomes when their interests and goals are considered in the transition process.  Inclusion yields more appropriate goals, increased motivation, greater self-confidence, and higher prospects for post-transition employment.  Moreover, student-services determinations of what services are appropriate for students with disabilities are fraught with error; research suggests that a teacher's impression of a student is a poor indicator of post-transition success because a student's performance in the classroom is different from her performance in a supportive place of employment.  Surveys show that workers deemed "unemployable" by some can in fact be reliable and conscientious employees.  Thus, a school district's decision to exclude a student from the transition process unfairly lessens that student's chance for a productive future.

## ARGUMENT

### I.  THE IDEA'S LEGISLATIVE HISTORY AND PURPOSE COMPEL INCLUSIVE POLICIES IN TRANSITION PLANNING.

As explained above, *supra* at 5, the Gibsons correctly interpret the IDEA and the U.S. Department of Education regulations as requiring an inclusive transition process.  In particular, 34 C.F.R. § 300.321(b)(1) provides that a public agency "*must* invite a child with a disability to attend the child's IEP Team meeting" where "the purpose of the meeting will be the consideration of

postsecondary goals" and "the transition services needed to assist the child in reaching those goals." (emphasis added). Here, Forest Hills' unilateral determination of Chloe's abilities post-transition and her exclusion from the transition process violate that regulation. Further, Forest Hills' conclusion that Chloe was too disabled to participate in the planning of her own future is exactly the sort of discriminatory action the IDEA was intended to guard against.[2] The IDEA's terms, purpose, and history all compel the conclusion that school districts must include all students—regardless of the severity of their disabilities—in the transition planning process. The District Court rightly determined that a school district's vision of a student's future, or of the severity of her disability, should have no bearing on complying with the legally required procedures for planning that student's transition. *See* Dist. Ct. Order, R. 35, Page ID# 719 n.5.[3] Instead, each student deserves full application of all procedures that will give her the opportunity to be a "fully-functioning, productive, and co-equal member[] of

---

[2] The parties disagree on how to categorize the severity of Chloe's disability. *See* Defs.' Br. at 11; Gibsons' Br. at 5. The district court, quoting the state level review officer's finding of facts, noted that "evaluations that have been done place [Chloe's] I.Q. in the moderate mental retardation range." *See* Dist. Ct. Order, R. 35, Page ID# 696 (quotation omitted).

[3] The district court initially stated that the invitation was mandatory, but then appeared to reverse course in its order denying Defendants' motion for a stay pending appeal. *See* Order, R. 69, Page ID# 1427. It is the contention of *amici curiae* that excluding a student because of the severity of their disability is inappropriate, *see* 34 C.F.R. § 300.321(a)(7) & (b)(1), and that all students are entitled to inclusive transition practices.

society." *Oberti v. Bd. of Educ. of Borough of Clemonton Sch. Dist.*, 801 F. Supp. 1392, 1407 (D.N.J. 1992).

### A.   Congress Enacted the Education of All Handicapped Children Act to Protect All Students, Regardless of Disability.

The IDEA is rooted in the equal protection and due process guarantees of the Fourteenth Amendment to the United States Constitution.  *See* Edwin Martin et al., *The Legislative and Litigation History of Special Education*, The Future of Children, at 25 (Spring 1996) ("Federal courts, interpreting the equal protection and due process guarantees of the Fourteenth Amendment to the U.S. Constitution, ruled that schools could not discriminate on the basis of disability and that parents had due process rights related to their children's schooling.").  In 1975, Congress enacted the EAHCA, the IDEA's predecessor, to ensure that students, "*whatever their* [*disability*],"[4] would "be given the chance to develop their abilities as individuals and to reach out with their peers for their own personal goals and dreams."  Education for all Handicapped Children, 1973–74: Hearings on S6 Before the Subcomm. on the Handicapped of the Senate Comm. on Labor and Public Welfare, 93d Cong., 1st Sess. (1973–74) (Statement of Sen. Kennedy) (emphasis added); *see also* 120 Cong. Rec. S15271 (1974) ("[T]he failure to

---

[4] Where appropriate, a*mici curiae* have changed references to students with "handicaps" to students with "disabilities" so as to be consistent with current federal statutes such as the Americans with Disabilities Act, the IDEA, or the Rehabilitation Act.

provide an education which meets the needs of a single [child with a disability], or the refusal to recognize the [right to grow of a child with a disability]—is a travesty of justice and a denial of equal protection of the law.") (Statement of Sen. Williams).  As the name suggests, all students with disabilities are afforded protection under the Act.

Prior to the passage of the EAHCA, many states refused to include students in the educational process because local officials deemed them "uneducable."  *Id.* at 26.  At that time, "more than half of the [children with disabilities] in the United States did not receive what Congress considered appropriate educational services, and a million children with disabilities were entirely excluded from public schools."  Melissa C. George, *A New IDEA: The Individuals with Disabilities Education Act After the 1997 Amendments*, 23 Law & Psychol. Rev. 91, 93 (1999).

Through the EAHCA, Congress sought to remedy these dramatic shortfalls in education for children with disabilities.  The statute made plain that each state seeking financial assistance under the EAHCA must assure that "*all* children with disabilities residing in the State, . . . *regardless of the severity of their* [*disability*]," be entitled to special education and related services.  *See* 20 U.S.C. § 1412(a)(3)(A) (emphasis added).  Through this language, it was emphasized that students with the most severe disabilities "are actually given *priority* under the Act."  *Timothy W. v. Rochester, N.H., Sch. Dist.*, 875 F.2d 954, 960 (1st Cir. 1989);

*see also* 121 Cong. Rec. S37413 (1975) (clarifying that the EAHCA "assures that [students with disabilities] in the greatest need will be given priority by requiring that services be provided first to those children not receiving an education; and second, to those children with the most severe [disabilities] receiving an inadequate education") (Statement of Sen. Williams).

Following the law's enactment, courts uniformly confirmed its broad reach. In *Timothy W.*, the First Circuit considered whether the school district could exclude a student from receiving special education "if he cannot benefit from that education."  875 F.2d at 955.  The court found that the language of the EAHCA "could not be more unequivocal" that there are no exceptions for students with severe disabilities.  *Id.* at 960.  Rather than categorizing students based on the severity of their disability and affording them services based on that categorization, Congress "permeated [the statute] with the words '*all* handicapped children' whenever it refers to the target population.  It never speaks of any exceptions for severely handicapped children."  *Id.*  To make it even clearer that the new law represented a significant departure from past practices, the court noted that it is "clear that a 'zero-reject' policy is at the core of the Act," *id.*, as public education "encompasses a universal right" not dependent "upon any type of guarantees that the child will benefit from the special education," *id.* at 966.

The analysis in *Timothy W.*—that no student's disability is too severe to prevent her from enjoying the law's protection —is common.  Courts interpreting the EAHCA regularly caution against reverting to a pre-EAHCA system whereby certain services or statutory provisions were available only to those students with mild or moderate disabilities.  For example, in *Kruelle v. New Castle County School District*, 642 F.2d 687 (3d Cir. 1981), the Third Circuit considered what constituted an appropriate education for a child who was "profoundly retarded," "afflicted with cerebral palsy," and as a thirteen-year old "has the social skills of a six month old child [and an I.Q.] well below thirty."  *Id.* at 688.  In answering the question, the court looked to "the unequivocal congressional directive to provide an appropriate education for all children regardless of the severity of the [disability]."  *Id.* at 695.  Perhaps most importantly for present purposes, the Third Circuit recognized that "[t]he language and the legislative history of the Act simply do not entertain the possibility that some children may be untrainable."  *Id.*; *see also Gladys J. v. Pearland Indep. Sch. Dist.*, 520 F. Supp. 869, 879 (S.D. Tex. 1981) ("The language and legislative history of [the EAHCA] simply do not admit of the possibility that some children may be beyond the reach of our educational expertise."); *Garrity v. Gallen*, 522 F. Supp. 171, 215 (D.N.H. 1981) (recognizing that "many severely and profoundly retarded individuals across the country who,

although at one time were cast aside as 'untrainable,' have through habilitation learned to care for themselves and in some instances to acquire vocations.").

In sum, the EAHCA—the precursor to the IDEA—barred school districts from treating students differently based on the severity of their disability, and courts interpreting the law universally reject arguments that certain students may not benefit from the law's requirements and safeguards.

### B. The Individuals with Disabilities Education Act Likewise Protects All Students and Emphasizes Inclusive Transition Planning.

Congress reauthorized the EAHCA in 1990 and renamed it the Individuals with Disabilities Education Act.  (codified as amended at 20 U.S.C. § 1400(a)). Like the EAHCA, the IDEA affords protection to all students, regardless of disability.  The law further empowers students by "greatly strengthen[ing] the involvement of students with disabilities in decisions regarding their own futures [and] facilitate movement from school to post-school activities."  64 Fed. Reg. 12,406, 12,472 (Mar. 12, 1999).  For example, in its 1997 reauthorization of the law, Congress defined "transition services" as:

> a coordinated set of activities for a student with a disability that--
>
> (A) is designed within an outcome-oriented process, which promotes movement from school to post-school activities, including post-secondary education, vocational training, integrated employment (including supported employment), continuing and adult education, adult services, independent living, or community participation;

> (B) is based upon the individual student's needs, taking into account the student's preferences and interests; and
>
> (C) includes instruction, related services, community experiences, the development of employment and other post-school adult living objectives, and, when appropriate, acquisition of daily living skills and functional vocational evaluation.

20 U.S.C. § 1401(30) (1997).  In this way and others, Congress "communicated that the content of a student's education should be focused on *his or her* postschool aspirations."  Paula D. Kohler & Sharon Field, *Transition-Focused Education: Foundation for the Future*, 37 J. of Spec. Ed. 174, 174 (2003) (emphasis added).

The regulations attendant to the 1997 amendments also expressly addressed student involvement in the transition planning process:

> With respect to student involvement in decisions regarding transition services, § 300.344(b) provides that (1) "*the public agency shall invite a student with a disability of any age to attend his or her IEP meeting* if a purpose of the meeting will be the consideration of- (i) The student's transition services needs under § 300.347(b)(1); or (ii) The needed transition services for the student under § 300.347(b)(2); or (iii) Both;" and (2) "If the student does not attend the IEP meeting, the public agency shall take other steps to ensure that the student's preferences and interests are considered."

64 Fed. Reg. at 12,473 (citing 34 C.F.R. § 300.344 (now codified at 34 C.F.R. § 300.321)) (emphasis added).  A subsequent (and current) version of the relevant regulation replaced the phrase "shall invite a student with a disability" with "*must* invite a child with a disability."  34 C.F.R. § 300.321 (emphasis added); *see also*

Bonnie Spiro Schinagle, *Considering the Individualized Education Program: A Call for Applying Contract Theory to an Essential Legal Document*, 17 CUNY L. Rev. 195, 210 n.92 (2013) (explaining that "if the purpose of an IEP meeting is to discuss transition goals," then "the child must be invited"). Accordingly, the invitation to the student is mandatory.

Comments by the Department of Education similarly confirm that students must be included:

> The Department believes it is important for a child with a disability to participate in determining the child's postsecondary goals and for the IEP Team to consider the child's preferences and interests in determining those goals.

71 Fed. Reg. 46,540, 46,672 (Aug. 14, 2006). Likewise, when confronted with a comment that the mandatory invitation requirement was "too rigid" and "should be modified to provide more flexibility for individual children," the Department of Education emphasized that "*it is critical for children with disabilities to be involved in determining their transition goals, as well as the services that will be used to reach those goals*." 71 Fed. Reg. at 46,671 (emphasis added). Accordingly, the regulations "require[] the public agency to invite the child to attend IEP Team meetings in which transition goals and services will be discussed." *Id.*

The legislative history of the IDEA thus shows a "heighten[ing of] the IDEA's transition services requirement," because "transition services were of great importance." *Forest Grove Sch. Dist. v. Student*, No. 3:12-civ-01837, 2014 WL 2592654, at *27 (D. Or. June 9, 2014). When Congress reauthorized the Act in 2004, it reiterated that transition services "are an essential tool which prepare 'special education students to leave high school ready to be full productive citizens, whether they choose to go on to college or a job.'" *Id.* at *77 (quoting 150 Cong. Rec. S11653-01, S11656 (Nov. 19, 2004) (Conf. Rep. accompanying H.R. 1350) (Statement of Sen. Dodd)). And these provisions—including the need to take full account of the student's interests, preferences, and goals—"are not optional." *Carrie I. v. Dep't of Educ.*, 869 F. Supp. 2d 1225, 1243-44 (D. Haw. 2012). Rather, the "IDEA *required* that students be involved in transition planning and that students' preferences and interests be taken into account when transition services are planned." Kohler & Field, *supra*, at 175 (emphasis added).

All told, under the IDEA, school districts do not enjoy the discretion unilaterally to abandon procedural safeguards for students. Rather, school districts must refrain from deciding which students may be actively involved in their transition planning based on the severity of their disabilities. The legislative history confirms the role of all students, including those with severe disabilities, in the transition planning process. First, the legislative history of the EAHCA shows

that Congress intended for the legislation to apply to all students with disabilities, regardless of the severity of that disability. *See Vance v. Spencer Cnty. Public School*, No. 3:96-cv-449, 1999 WL 33603124, at \*2 (W.D. Ky. Jan. 4, 1999) ("Federal courts have consistently applied EAHCA case law to interpret the IDEA."). Second, the IDEA's legislative history demonstrates the importance not only of transition planning, but also of the student's involvement in that process. Taken together, these principles show that Forest Hills' decision to exclude Chloe was wrong.

## II.   STUDENT PARTICIPATION IS CRITICAL FOR A SUCCESSFUL TRANSITION.

Not only does the IDEA's text, history, and purpose compel student participation, but empirical research also shows that participation and success are directly linked. As such, Forest Hills' exclusion of Chloe from the transition process reduces her chances for a productive transition, a troubling result at odds with the IDEA's emphasis on including the student in the transition process. All students are entitled to be involved in their transition planning, because "students with disabilities have more trouble fitting into real-life roles without preparation and transition." Dean Hill Rivkin, *Legal Advocacy and Education Reform: Litigating School Exclusion*, 75 Tenn. L. Rev. 265, 275 (2008). Indeed, providing adequate transition services to students with disabilities is critical as "their last

chance for a successful transition from high school into higher education, the

working world, or independent living." *Id.*

### A. The Student Is at the Center of the IDEA's Emphasis on Transition Services.

As explained above, *supra* at 12-13, One of the primary differences between

the IDEA and its predecessor, the EAHCA, is the IDEA's emphasis on transition

services. *See* Erik W. Carter et al., *Predictors of Postschool Employment*

*Outcomes for Young Adults with Severe Disabilities*, 23 J. of Disability Policy

Studies 50, 50 (2012) ("[A] central purpose of special education is to prepare

students with disabilities for further education, employment, and independent

living as part of a national policy aimed at ensuring equality of opportunity, full

participation, independent living, and economic self-sufficiency for individuals

with disabilities.") (internal quotation marks omitted) (hereinafter Carter I).  Two

fundamental requirements of the IDEA's transition policy are involving the student

and considering her personal interests and preferences.  *See* Michael L. Wehmeyer

& Michelle Schwartz, *The Self-Determination Focus of Transition Goals for*

*Students with Mental Retardation*, 21 Career Development for Exceptional

Individuals 75, 76 (1998) ("Student involvement is at the heart of the transition

services mandate in IDEA.").  But, where mere assumptions about the student's

abilities inform a transition plan—rather than the student's individuality—the

result is often a self-fulfilling prophecy of reduced futures, unemployment, and dependence.

**B.    A Lack of Adherence to the IDEA's Transition Policy Fails to Meet the Law's Goals.**

Despite the IDEA's transition process, still today far too many students with disabilities, and in particular students with severe disabilities, are unable to take full advantage of the transition policy.  Surveys of adults with severe disabilities show fewer than a quarter participating in suitable employment.  Erik W. Carter et al*., Factors Associated with the Early Work Experiences of Adolescents with Severe Disabilities*, 49 Intellectual & Development Disabilities 233, 233 (2011) (hereinafter Carter II); *see also* Shattuck P. Carter et al., *Postsecondary Education and Employment Among Youth with an Autism Spectrum Disorder*, 129 Pediatrics 1042 (2012) (finding that over half of young adults with ASD had neither held paid employment nor enrolled in vocational training or college in the first two years after high school).  Other studies "reveal the pervasiveness of dismal employment outcomes for individuals with severe disabilities," Carter II, *supra*, at 233, such that "the prevailing transition bridge could be readily characterized as a 'bridge to nowhere' for substantial numbers of youth with severe disabilities," Carter I, *supra*, at 50 (citation omitted).  Together, these factors explain why adults with more severe disabilities are significantly more likely to live in poverty.  Nicholas Certo et al., *Seamless Transition and Long-Term Support for Individuals with*

*Severe Intellectual Disabilities*, 33 Research & Practice for Persons with Severe Disabilities 85, 88 (2008) ("Adults with severe intellectual disabilities are three times more likely than their non-disabled peers to live in poverty with household incomes of $15,000 or less.").

These poor outcomes are particularly evident in female students, like Chloe. Research indicates that female students with disabilities have worse outcomes than their male counterparts. *See* Carter I, *supra*, at 59 ("[M]ales had nearly twice the odds of working than females."); *see also* Michael Wehmeyer & Margaret Lawrence, *Whose Future Is It Anyway? Promoting Student Involvement in Transition Planning*, 18 Career Development for Exceptional Individuals 69, 79 (1995) ("Research indicates that young women with cognitive disabilities graduate to less positive outcomes"). According to one researcher, "young women feel disempowered" and "come to believe that they don't have control over their lives, particularly in educational settings." *Id.* at 79-80.

One reason transition policies fail is of particular relevance to this case: lowered expectations for students with more severe disabilities. School districts and agency personnel often presume that students like Chloe are incapable of being independent, productive members of society. Yet this exclusionary mindset is often the reason itself—as opposed to the student's disability—why transition planning fails. *See id.* at 69-70 ("[T]he current reality for many students with

disabilities is that they are left out of the transition planning process, from goal development to placement and instructional decision-making.") (citation omitted); *see also* David Hagner et al., *Outcomes of a Family-Centered Transition Process for Students with Autism Spectrum Disorders*, 27 Focus on Autism & Other Developmental Disabilities 42, 43 (2012) ("Poor adult outcomes and low expectations for persons with ASD are often the result of a planning process that is not person and family centered.").  One study of integrated employment settings revealed "examples of individuals . . . assumed at first [to] be difficult to place, but who have been working successfully for several years."  Patricia Rogan & Susan Rinne, *National Call for Organizational Change from Sheltered to Integrated Employment*, 49 Intellectual & Developmental Disabilities 248, 255 (2011).  One respondent even noted that 20% of its employees with disabilities "were declared unemployable by others."  *Id.*

Forest Hills' decision not to include Chloe fully in her transition planning is both regrettable and common.  All too often, students with disabilities do not receive adequate instruction "because it is assumed that they cannot learn problem-solving or decision-making skills."  *See* Wehmeyer & Schwartz, *supra*, at 83.  In one study analyzing the positive effect of high school vocational experiences on students with disabilities, the authors noted that teacher assessments are often inaccurate:

> In light of the emphasis such skills have received within
> the literature, we were initially surprised that teachers'
> ratings of social skills, behavior, and self-advocacy were
> not strongly associated with paid work during secondary
> school.  Because teachers' ratings of these skill domains
> were anchored to classroom contexts, rather than to the
> workplace, it may be that different combinations of
> social-related and self-determination skills are more
> directly linked to job success.

Carter II, *supra*, at 243.  The IDEA's mandated student-centered transition

planning, as opposed to planning based on assumptions of a student's abilities,

requires the full, genuine inclusion of the student.

### C.    Student Involvement in Transition Planning Yields Better Outcomes.

Finally, multiple studies show that involving students, including those with

more severe disabilities, in setting their transition goals yields both better goals and

better outcomes.  Accordingly, including students like Chloe in the transition

planning process increases their chances to succeed post-transition.

First, inclusive transition policies make it more likely that the IEP team will

create appropriate goals that Chloe will meet.  Study after study stresses the

importance of "students' playing a central role in planning and preparing for

postschool outcomes."  Kohler & Field, *supra*, at 175.  Thus, "students who choose

their school activities are more motivated to perform the tasks they select.

Likewise, opportunities to express preferences leads to enhanced educational

outcomes."  Wehmeyer & Lawrence, *supra*, at 69.  Not only do inclusive transition

policies create better goals, but students also are more likely to achieve those goals. Kohler & Field, *supra*, at 175 ("[S]tudents who are more involved in setting their educational goals are more likely to achieve those goals.").  Proper student-focused planning thus makes educational decisions "based on students' goals, visions, and interests," and is developed "in partnership with the student and his or her family." *Id.* at 176.

Second, the benefits of including a student in the development of her transition goals also leads to better outcomes after graduation.  Integrated employment settings, which have been shown to increase the quality of life for a person with disabilities, requires, among other things, "student self-determination." Rogan & Rinne, *supra*, at 257.  Such self-determination, or being able to control one's life and destiny, allows "adolescents with cognitive disabilities [to] leave school to more positive adult outcomes" and to "experience a higher quality of life."  Wehmeyer & Schwartz, *supra*, at 76.  When students take ownership over their transition, they are put in a far better position than when their opinions and interests are overlooked.  *See* Jaimie Ciulla Timmons, *Choosing Employment: Factors that Impact Employment Decisions for Individuals with Intellectual Disability*, 49 Intellectual & Developmental Disabilities 285, 297 (2011) ("Those who feel confident making their own choices will be better prepared to participate

in the job-development process and decide for themselves whether or not they want to accept a job.").

When students feel empowered—that they are a contributor to their transition planning, as opposed to only the subject of it—they have better outcomes, both in and out of school. Making an effort to allow participation "is a small price to pay to increase the opportunity of individuals with disabilities to become fully-functioning, productive, and co-equal members of society, and of individuals without disabilities to learn to live in a world where individuals with disabilities are so included." *Oberti*, 801 F. Supp. at 1407.

## CONCLUSION

In sum, Forest Hills' decisions are not supported by the IDEA nor by the research underlying the policies the law espouses. For these reasons, the Court should affirm the district court's judgment requiring Forest Hills to provide transition services that are truly inclusive of Chloe, and that take into account her interests, preferences, and goals.

Dated:        March 25, 2015            Respectfully submitted,

/s/ Neil N. Vakharia

Neil N. Vakharia (Ohio 008203)
 *Counsel of Record*
JONES DAY
901 Lakeside Avenue
Cleveland, OH  44114-1190
Telephone:  (216) 586-3939
Facsimile:   (216) 579-0212

Chad A. Readler (Ohio 0068394)
Kimberly A. Jolson (Ohio 0081204)
JONES DAY
325 John H. McConnell Boulevard
Suite 600
P.O. Box 165017
Columbus, OH  43216-5017
Telephone: (614) 469-3939
Facsimile:   (614) 461-4198

*Counsel for Amici Curiae Autism Speaks,*
*Council of Parent Attorneys & Advocates,*
*Inc., Disability Rights Tennessee, Michigan*
*Protection and Advocacy Service, Inc., and*
*National Disability Rights Network*

## CERTIFICATE OF COMPLIANCE WITH RULE 32(A)(7)(C)
## OF THE FEDERAL RULES OF APPELLATE PROCEDURE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of this brief, as provided in Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief includes 5,098 words.

2.      This brief has been prepared in proportionally spaced typeface using Microsoft Office Word 2007 in 14 point Times New Roman font. As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C), the undersigned has relied upon the word count of this word-processing system in preparing this certificate.


Dated:      March 25, 2015          Respectfully submitted,


/s/ Neil N. Vakharia
_____

Neil N. Vakharia
*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing Brief of *Amici*

*Curiae* with the Clerk of the Court using the CM/ECF system, which will send a

notification of such filing to the appropriate counsel.  If any parties or their counsel

of record are not registered users, I have served them by placing a true and correct

copy of the foregoing document in the United States mail, postage prepaid, to their

address of record.

Dated:        March 25, 2015            Respectfully submitted,


/s/ Neil N. Vakharia

Neil N. Vakharia
*Counsel for Amici Curiae*